# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SETH CHARLES BEN HAIM, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | 08-cv-520 (RCL) |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION

This action arises out of the April 9, 1995 suicide bombing of a bus in the Gaza Strip region of Israel that killed eight and wounded dozens, including Seth Haim, a United States citizen living in Israel at the time. Seth, along with his father and brother, previously brought suit against defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information and Security ("MOIS") pursuant to the "state-sponsored terrorism" exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330 & 1602 *et seq.*, then codified at 28 U.S.C. § 1605(a)(7), in which they alleged that Iran and MOIS aided the Shaqaqi Faction of the Palestine Islamic Jihad ("PIJ"), the terrorist group responsible for the Gaza Strip attack. After reviewing the evidence, this Court found that "Iran and the MOIS conspired to provide material support and resources to the . . . PIJ, a terrorist organization, . . . which caused the injuries to Seth." *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 61 (D.D.C. 2006) ("*Haim I*"). The *Haim I* Court thus awarded plaintiffs $16 million in compensatory damages, *id*. at 76, though it denied their request for punitive damages. *Id*. at 71.

Less than two years later, Congress enacted the National Defense Authorization Act for Fiscal Year 2008. Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338–44 (2008) ("NDAA"). That statute repealed the previous state-sponsored terrorism exception and replaced it with a new exception codified at 28 U.S.C. § 1605A. This new provision "creat[es] a federal right of action against foreign states, for which punitive damages may be awarded." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 40 (D.D.C. 2009) (citing *Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008)) ("*In re Terrorism Litig.*"). Plaintiffs here—the same as in *Haim I*—bring this suit to take advantage of the new remedies provided in § 1605A. For the reasons set forth below, the Court finds that plaintiffs have established a right to relief under the new state-sponsored terrorism exception, and awards damages as appropriate.

## II. PROCEDURAL HISTORY

### A. *Haim I*

Plaintiffs filed their original § 1605(a)(7) action against defendants in 2002. *Haim I*, 425 F. Supp. 2d at 59. At the time, the state-sponsored terrorism exception did not provide an independent cause of action, but instead acted "as a 'pass-through' to substantive causes of action against private individuals that . . . may exist in federal, state or international law." *Id.* at 68 (citing *Damarrell v. Islamic Republic of Iran*, No. 01 Civ. 2224, 2005 U.S. Dist. LEXIS 5343, at *27–32 (D.D.C. Mar. 29, 2005)). Following standard practices in FSIA actions under § 1605(a)(7), plaintiffs' *Haim I* Complaint set forth causes of action for battery, assault and intentional infliction of emotional distress under D.C. law. *Id.* at 69–70.

Due to "developments unrelated to the lawsuit," as well as "the fragile mental status" of the lead plaintiff, the *Haim I* Court received evidence "via affidavit and deposition rather than live testimony." *Id.* at 59 n.1. These submissions included affidavits from each plaintiff

2

concerning his experiences during the bombing and its aftermath, the deposition of an expert on the PIJ and Israeli affairs, and substantial documentary evidence. *Id*. at 59–60. In addition, the *Haim I* Court took judicial notice of its findings in *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1 (D.D.C. 1998)—an earlier FSIA case arising out of the same Gaza Strip bombing that injured Seth Haim. *Haim I*, 425 F. Supp. 2d at 59. Examining all of the evidence, this Court found that Seth's "injuries were caused . . . by a bomb that was deliberately driven into the bus by a member of . . . the PIJ acting under the direction of defendants." *Id*. at 61.

Based on these findings of fact, the *Haim I* Court concluded that "Iran, the MOIS and PIJ had agreed to commit terrorist activities"—such as the bombing of the Gaza Strip bus in 1995 that injured Seth—and thus defendants were vicariously liable for the attack. *Id*. at 69. Applying D.C. law, the Court held that Iran and MOIS were liable for the intentional torts of battery, assault and intentional infliction of emotional distress. *Id*. at 69–70. In determining damages, the Court compared the injuries of Seth and his family members with other families that have been victimized by tragic incidents of terrorism. *Id*. at 73–76. Following this review, the Court awarded Seth Haim $11 million, his father Bernard Klein Ben Haim $3.5 million, and his brother Lavi Klein Ben Haim $1.5 million in compensatory damages. *Id*. The Court declined to award punitive damages, however, because the FSIA and other relevant statutory provisions did not permit such an award at that time. *Id*. at 71.

**B.     This Action**

Plaintiffs filed this suit in early 2008, shortly after Congress enacted the new state-sponsored terrorism exception by passing the NDAA. Complaint, Mar. 26, 2008 [1]. Their Complaint sets forth a cause of action for damages under 28 U.S.C. § 1605A, *id*. at ¶¶ 7–9, which is supported by allegations that "Defendants provided PIJ with material support and
3

resources and other substantial aid and assistance, in order to aid abet, facilitate and cause the commission of acts of international terrorism," and that "[t]he harm and injuries suffered by plaintiffs due to the terrorist bombing were the direct and proximate result of defendants' conduct." *Id*. at ¶¶ 35, 39. Plaintiffs seek compensatory and punitive relief. *Id*. at 9.

Plaintiffs served copies of the relevant papers on defendants through diplomatic channels. Certificate of Clerk, July 6, 2010 [12].[1] According to the diplomatic note returned to the Court, this service was effective as of September 5, 2010, Return of Service/Affidavit, Dec. 16, 2010 [14], obligating Iran and MOIS to respond to the Complaint by November 4, 2010. *See* 28 U.S.C. § 1608(d) (stating that defendants shall "serve an answer or other responsive pleading . . . within sixty days after service has been made under this section"). Having received no response by the statutory deadline, plaintiffs requested that defendants be declared in default, Affidavit for Default, Dec. 24, 2010 [16], which the Clerk of Court entered shortly thereafter. Clerk's Entry of Default, Dec. 27, 2010 [17]. Plaintiffs subsequently moved the Court to enter a default judgment on their behalf. Motion for Default Judgment, Jan. 5, 2011 [18]. In granting this motion, the Court—based on the motion papers, the record in these proceedings, and facts available for judicial notice—makes the following findings of fact and conclusions of law.

## III. FINDINGS OF FACT

Though defendants have not appeared in this action—and thus do not dispute plaintiffs' allegations in their Complaint—under the FSIA the Court cannot enter judgment on this basis alone. *See* 28 U.S.C. § 1608(e) (requiring courts to determine whether FSIA plaintiffs have

---

[1] Service in FSIA actions is governed by 28 U.S.C. § 1608(a), which permits four methods of service, in descending order of preference. This Court, by an Order in April, 2010, determined that the first two methods of service—by special arrangement and international treaty, *id*. at § 1608(a)(1)–(2)—were unavailable in this case, Status Report Order Regarding Service, Apr. 14, 2010 [7], and thereafter plaintiffs attempted service by the third method provided by statute: certified mail. Certificate of Clerk, Apr. 30, 2010 [10]. After that attempt failed, plaintiffs then turned to service by diplomatic channels, as permitted by statute. *See* 28 U.S.C. § 1608(a)(4) (permitting service by diplomatic channels "if service cannot be made within 30 days" by mail).

4

"establishe[d their] claim or right to relief by evidence that is satisfactory"). Instead, the Court must "inquire further before entering judgment against parties in default." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) ("*Rimkus II*"). To assist with this obligation, plaintiffs seek judicial notice of evidence and findings in *Flatow* and *Haim I*—two prior related cases. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (noting that FSIA courts may "take judicial notice of related proceedings and records").

Courts may take notice "of court records in related proceedings." 29 Am. Jurisdiction. 2d Evidence § 151 (2010); *see also Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938) ("A court may take judicial notice, and give effect to, its own records in another but interrelated proceeding . . . ."); 2 McCormick on Evid. § 332 (6th ed. 2009) (noting that principle permitting courts to take judicial notice of current proceeding "is equally applicable to matters of record in the proceedings in other cases in the same court"). Notice of prior findings of fact, however, is another matter. Because courts may rely upon the accuracy of published judicial opinions, judicial findings of fact are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). However, prior findings are merely "probabilistic determinations based upon a limited set of data points—the evidence," *Rimkus II*, 750 F. Supp. 2d at 172, and thus *not* "not subject to reasonable dispute"—a necessary requisite under the Federal Rules of Evidence. *Id.* at 201(b). Findings of fact in prior proceedings are therefore not subject to judicial notice. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58 (D.D.C. 2010).

Though aware of the limits of judicial notice, the Court is also mindful of the context of this case—a default action in which defendants Iran and MOIS have chosen not to contest the allegations and evidence presented by plaintiffs. The statutory obligation imposed by § 1608(e)

5

requires that the Court undertake an investigation into plaintiffs' allegations; it is not, however, "designed to impose the onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Rimkus II*, 750 F. Supp. 2d at 172 (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). The Court will thus adhere to the established "middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation . . . to reach their own, independent findings of fact in the cases before them." *Id*. (citing *Murphy*, 740 F. Supp. 2d at 59.

Here, plaintiffs request that the Court take judicial notice of the proceedings in *Flatow* and *Haim I*, both of which arose out of the 1995 Gaza Strip bombing at the center of this action. In *Flatow*, this Court held a two-day evidentiary hearing, at which time it heard lengthy sworn testimony and received extensive documentary evidence. 999 F. Supp. at 6. The *Flatow* Court also heard testimony from several experts, including Dr. Reuven Paz, Dr. Patrick Clawson and former FBI Deputy Assistant Director for Counterterrorism Harry Brandon.[2] *Id*. at 8–9. In *Haim I*, this Court collected affidavits from each plaintiff in this suit as well as an expert on the PIJ and Israel, and received documentary evidence specific to the Haim family. 425 F. Supp. 2d at 59. Bearing in mind the parameters of judicial notice set forth above, the Court takes notice of the evidence presented in *Flatow* and *Haim I*, and renders the following findings of fact:

*Parties*

The plaintiffs in this action are Seth Charles Klein Ben Haim, his father Bernard Klein Ben Haim, and his brother Lavi Klein Ben Haim. *Haim I*, 425 F. Supp. 2d at 60. Seth was born in the United States, and though he has lived in both the United States and Israel throughout his

---

[2] Both Drs. Paz and Clawson have been previously recognized by the courts of this district as experts in the field of Iranian involvement in state-sponsored terrorism in the modern era. *See Murphy*, 740 F. Supp. 2d at 60 (noting that Dr. Paz has researched Islamic groups for 25 years); *Valore*, 700 F. Supp. 2d at 62 (stating that Dr. Clawson is "a widely-renowned expert on Iranian affairs").

life, he has maintained his American citizenship. *Id*. His father Bernard and brother Lavi are also both American citizens, though Bernard now lives permanently in Israel. *Id*.

Defendant Iran "is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Expert Administration Act of 1979, 50 U.S.C. § 2405(j), continuously since January 19, 1984," *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006)—well before the 1995 attack. According to various experts that testified in *Flatow*, Iran "provides material support and resources to [the PIJ] by supplying funds and training for the Shaqaqi Faction's terrorist activities in the Gaza Strip region." 999 F. Supp. at 9. Defendant MOIS "is the Iranian intelligence service, functioning both within and beyond Iranian territory." *Haim I*, 425 F. Supp. 2d at 61 (internal quotations omitted). Drs. Paz and Clawson have previously testified that MOIS "acted as a conduit for the Islamic Republic of Iran's provision of funds and training to the Shaqaqi Faction for its terrorist activities in the Gaza Strip region." *Flatow*, 999 F. Supp. at 10.

*The April 9, 1995 Suicide Bombing*

On April 9, 1995, Seth Haim was a passenger on a bus which was traveling from Ashkelon, Israel to a Mediterranean resort in the Gush Katif community. Based on the evidence before it, the *Flatow* Court provided the following description of the ensuing events: "At or about 12:05 p.m. local time, near Kfar Darom in the Gaza Strip, a suicide bomber drove a van loaded with explosives into the number 36 Egged bus, causing an explosion that destroyed the bus." *Id*. at 7; *see also* U.S. Dep't of State, *Patterns of Global Terrorism 1995* app. A, *available at* http://www.hri.org/docs/USSD-Terror/95/append-a.html (last visited Dec. 28, 2010) (stating that on April 9, 1995, "[a] suicide bomber crashed an explosive-rigged van into an Israeli bus, killing a U.S. citizen and seven Israelis"). Documentary evidence establishes that, shortly after

7

the explosion, the "Shaqaqi Faction of the PIJ claimed responsibility for . . . the terrorist attack" on Egged bus 36. *Haim I*, 425 F. Supp. 2d at 61; *see also Patterns of Global Terrorism 1995*, *supra* at app. A ("The Palestine Islamic Jihad (PIJ)-Shaqaqi Faction claimed responsibility for the [April 9th] attack.").

According to his own testimony, Seth Haim was forcefully thrown into the air as a result of the explosion. *Haim I*, 425 F. Supp. 2d at 61. His body and skull were punctured by shrapnel in several locations, and other parts of his body were cut and bleeding. *Id*. Seth's father learned of the bombing from a radio report, and rushed to a local hospital with Seth's younger brother in hopes of locating him. *Id*. at 61–62. According to the testimony, Seth's father—who believed that Seth had been killed in the explosion—became "hysterical." *Id*. at 62. Eventually, Seth's family found him "covered in blood and screaming." *Id*. Seth's injuries were extremely severe, leaving him in a critical condition from which it took several weeks of constant treatment at multiple hospitals to recover. *Id*. at 62–63.

*Iranian Support for the PIJ and Involvement in the 1995 Bombing*

The *Flatow* Court received substantial evidence concerning defendants' relationship with the PIJ, including the testimony of experts Drs. Paz and Clawson, testimony from former FBI agent Brandon, and an affidavit from Stephen M. Flatow—father of another American citizen killed in the attack—who testified concerning the representations of then-Ambassador Philip Wilcox, the State Department's Coordinator for Counterterrorism. *Flatow*, 999 F. Supp. at 9. This evidence establishes the following: First, the Shaqaqi Faction of the PIJ was "a terrorist cell with a small core membership" whose "sole purpose [wa]s to conduct terrorist activities in the Gaza region." *Id*. Second, Iran was the group's "sole source of funding," and provided "approximately two million dollars to [PIJ] annually in support of terrorist activities." *Id*. Third,

Iran supplied "funds and training for the Shaqaqi Faction's terrorist activities in the Gaza Strip region." *Id*. And fourth, defendant MOIS acted "as a conduit for . . . Iran's provision of funds and training to the Shaqaqi Faction." *Id*. at 10. Taken together, these facts conclusively establish that defendants Iran and MOIS provided material support to the PIJ, leading to the 1995 suicide bombing that injured Seth Haim. *Id*. at 9–10; *cf.* U.S. Dep't of State, *Patterns of Global Terrorism 1995* app. B, *available at* http://www.hri.org/docs/USSD-Terror/95/append-b.html (last visited Dec. 28, 2010) (noting that PIJ "receives financial assistance from Iran").

IV. **CONCLUSIONS OF LAW**

Based on the above findings of fact, the Court reaches the following conclusions of law:

A. **Jurisdiction**

"[F]oreign states generally enjoy immunity from suit in U.S. courts." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 329 (D.C. Cir. 2003). This immunity is provided by the FSIA, which both withdraws original jurisdiction over suits against foreign states from all state and federal courts, and limits the circumstances in which a foreign state's sovereign immunity is waived so that a court may hear a claim against it. 28 U.S.C. §§ 1604 & 1605A(a)(2). These protections are not absolute, however, but are subject to certain enumerated exceptions—including the state-sponsored terrorism exception. *Id*. at 1605A(a)(1)–(2). The evidence before the Court establishes that the circumstances necessary for it to exercise jurisdiction and hear this dispute are present in this case.

1. **Original Jurisdiction**

The state-sponsored terrorism exception provides that federal courts possess original jurisdiction over suits against a foreign state only if (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of

9

torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." *Id*. at § 1605A(a)(1). Here, each of these elements has been established by sufficient evidence. First, plaintiffs seek only money damages. Complaint at 9. Second, defendant Iran is unquestionably a foreign state. As for MOIS, a foreign institution is treated as a foreign state under the FSIA if it constitutes "a political subdivision . . . or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Here, the evidence shows that MOIS "is an integral part of [Iran]'s political structure," and therefore constitutes a foreign state under the FSIA. *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). Third, the testimony before this Court in *Haim I* shows that Seth Haim "suffered tremendous pain and a loss of vision" resulting from the injuries caused by the suicide bombing. 425 F. Supp. 2d at 61. Fourth, the evidence presented to the *Flatow* Court establishes that the terrorist attack was a direct result of defendants' routine provision of support and assistance to the Shaqaqi Faction of the PIJ. 999 F. Supp. at 9–10. This evidence satisfies the FSIA's requirement that there be "some reasonable connection between the act . . . and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66. Finally, the prior testimony of several experts demonstrates that Iran and MOIS provided material support and financial assistance for the purpose of carrying out attacks like the April 9, 1995 bombing. 999 F. Supp. at 9. The Court may therefore properly exercise original jurisdiction over this action.

2. **Sovereign Immunity**

While the Court may exercise jurisdiction here, foreign states remain immune absent a waiver of sovereign immunity, which may occur voluntarily or by operation of statute. The state-sponsored terrorism exception provides that sovereign immunity is waived where (1) "the

foreign state was designated as a state sponsor of terrorism at the time the act . . . and . . . either remains so designated when the claim is filed under this section or was so designated within the 6-month period before the claim is filed under this section," (2) "the claimant or the victim was, at the time of the act . . . a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States . . . acting within the scope of the employee's employment," and (3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(i)–(iii).

Here, the evidence establishes facts sufficient to justify the waiver of defendants' sovereign immunity under the FSIA. First, Iran was designated a state-sponsor of terror by the U.S. Secretary of State well before the attack at issue here. U.S. Dep't of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984. Second, the victim of the terrorist attack—here, Seth Haim—was a U.S. citizen, and each of the plaintiffs are American citizens as well. *See supra* Section III. Finally, the suicide bombing occurred in Israel, not Iran, *see id.*, and thus the requirement to arbitrate the dispute is inapplicable. Defendants' sovereign immunity is thus waived by operation of statute, and the Court may hear this case.[3]

### B.     Retroactive Application of § 1605A to this Case

As set forth above, plaintiffs previously obtained relief against defendants under the earlier state-sponsored terrorism exception, which was codified at 28 U.S.C. § 1605(a)(7). *Haim I*, 425 F. Supp. 2d at 76. The NDAA, however, provides that plaintiffs may bring a second

---

[3] Plaintiff served the Amended Complaint on defendants through diplomatic channels on September 5, 2010. Return of Service/Affidavit. The Court thus has personal jurisdiction over the defendants. *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

action applying § 1605A retroactively in certain circumstances—including to seek punitive damages. *See Rimkus II*, 750 F. Supp. 2d at 179 ("[B]y the structure employed in the NDAA, Congress has made clear that actions for punitive damages under § 1605A—following on the heels of successful judgments for compensatory harms under § 1605(a)(7)—should be permitted."). The NDAA provides two procedures for such retroactive application: first, plaintiffs who fully prosecuted cases under §1605(a)(7) may bring new actions under § 1605A in limited circumstances; second, plaintiffs in pending §1605(a)(7) actions may seek to have their suits treated as if brought under §1605A. NDAA § 1083(c)(2)–(3). Because the *Haim I* action ended prior to the enactment of the NDAA, only the former approach is available here.

Under the terms of the Act, plaintiffs may only pursue their suit if, *inter alia*, their earlier case was "adversely affected on the grounds that [the prior provisions] fail to create a cause of action against the state," *id*. at § 1083(c)(2)(A)(iii), and this action was brought "within the 60-day period beginning on the date of the enactment of" the NDAA. *Id*. at § 1083(c)(2)(C)(ii). Both of these requisites are met here. As to the former condition, plaintiffs in *Haim I* were unable to obtain punitive damages because then-applicable law did not permit such relief, 425 F. Supp. 2d at 71, and this Court has previously held that the inability to obtain punitive damages under these earlier exception satisfies the retroactivity requirements of the NDAA. *See In re Terrorism Litig.*, 659 F. Supp. 2d at 64 ("[T]his Court reads the requirement that the prior actions must be adversely impacted . . . to include those instances in which plaintiffs failed to recover punitive damages, a critical component of these terrorism actions."). As to the latter condition, plaintiffs here instituted this action on March 26, 2008—fifty-eight days after the passage of the NDAA—and thus within the time limits set forth by the Act. *See id*. at 65 (observing that related FSIA suit must be brought by March 28, 2008). Plaintiffs' action may therefore proceed.

C. **Liability**

The FSIA's state-sponsored terrorism exception sets forth a cause of action for (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the provision provided, by the foreign state or an official, employee, or agent of the foreign state if the act (3) "caused" (4) "personal injury or death" (5) "for which courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. §§ 1605A(a)(1) & (c). The third and fourth elements of this claim—causation and injury—"demand that a plaintiff set forth sufficient facts that not only establish a causation as a factual matter, but that also demonstrate the culpability and liability of the defendant as a matter of law." *Rimkus II*, 750 F. Supp. 2d at 175. A plaintiff must therefore "'prove a theory of liability' . . . . generally through the lens of civil tort liability." *Id*. (quoting *Valore*, 700 F. Supp. 2d at 73). The Court examines each of these elements in turn.

1. **Act**

The evidence presented in *Flatow* establishes that defendants Iran and MOIS provided significant financial support and training to the PIJ, and that—buoyed by such support—its Shaqaqi Faction perpetrated a malicious bombing designed to kill innocent civilians. Such acts constitute material support for an extrajudicial killing under the FSIA.

The FSIA defines extrajudicial killing by reference to Section 3 of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1605A(h)(7), which defines an extrajudicial killing as

> [(1)] a deliberated killing [(2)] not authorized by a previous judgment pronounced by a regularly constituted court [(3)] affording all judicial guarantees which are recognized as indispensable by civilized peoples.

Torture Victim Protection Act of 1991 § 3(a), 28 U.S.C. § 1350 note. The evidence before the Court indicates that the attack on Egged bus 36 was a coordinated strike against several persons, and no evidence has been presented to show that any judicial body sanctioned that strike—nor could it. The very act of attacking a busload of defenseless civilians is contrary to the guarantees of freedom and security that are indispensable to all civilized peoples. Plaintiffs have thus demonstrated that the Shaqaqi Faction perpetrated an extrajudicial killing.

With respect to defendants' support for the perpetrators of this inhuman attack, the FSIA ties the concept of "material support or resources" to the definition found in the U.S. criminal code, 28 U.S.C. § 1605A(h)(3), which declares that such support

> means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). This Court has further clarified that "'the routine provision of financial assistance to a terrorist group in support of its terrorist activities constitutes providing material support and resources for a terrorist act within the meaning' of the state-sponsored terrorism exception." *Beer v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 08 Civ. 1807, 2010 U.S. Dist. LEXIS 129953, at *34 (D.D.C. Dec. 9, 2010) (quoting *In re Terrorism Litig.*, 659 F. Supp. 2d at 42) ("*Beer II*"). Moreover, where a defendant has provided regular financial support to a terrorist organization, "a plaintiff need not establish that the material support or resources provided . . . contributed directly to the act from which his claim arises." *Murphy*, 740 F. Supp. 2d at 71. Here, the evidence here establishes defendants' regular financial and technical support of the Shaqaqi Faction, which constitutes the provision of material support for an extrajudicial killing for which the Court may hold Iran and MOIS liable under the FSIA.

14

2. **Actor**

The Court has determined above that both Iran and MOIS provided material support as defined by the FSIA, and thus may be held liable under the Act's state-sponsored terrorism exception. *See supra* Section III.

3. **Theory of Recovery – Causation & Injury**

This Court has previously discussed at length the requirement imposed by the third and fourth element of the federal cause of action provided by § 1605A, which necessitates that plaintiff articulate a theory of recovery. *See generally Rimkus II*, 750 F. Supp. 2d at 175–76 (explaining need for plaintiffs "'to prove a theory of liability under which defendants cause the requisite injury or death'") (quoting *Valore*, 700 F. Supp. 2d at 73). Here, as in *Rimkus II*, "plaintiff's Complaint does not clearly articulate a particular theory of recovery, but rather alleges facts necessary to establish the five basic elements of a cause of action under § 1605A." *Id*. However the Court, as it did in that case, will not punish plaintiffs—whose complaint was filed long before courts had an opportunity to discuss the pleading implications of the NDAA—but will rather search the record for applicable theories.

The full prosecution of plaintiffs' previous suit provides suitable theories of recovery in this case. In *Haim I*, plaintiffs established causes of action for battery, assault, and intentional infliction of emotional distress by sufficient evidence. 425 F. Supp. 2d at 69–70. Though these were D.C. law claims, this Court has previously determined that where no substantive differences exist between state law and general theories of recovery articulated under § 1605A, the prior determination that state-law causes of action were established by substantial evidence also satisfies the theory-of-recovery requirement under the state-sponsored terrorism exception. *See Rimkus II*, 750 F. Supp. 2d at 184 ("Because no substantive differences exist between the

federal courts' articulation . . . and the [state] law equivalent, defendants are also liable to plaintiff in this action on this theory of recovery."). Here, there are no substantive differences between D.C. law and prior judicial articulations of either battery, assault or intentional infliction of emotional distress. *Compare Marshall v. District of Columbia*, 391 A.2d 1374, 1380 (D.C. 1978) (defining battery as "an intentional, unpermitted, harmful or offensive contact with his person or something attached to it"), *with Murphy*, 740 F. Supp. 2d at 74 (defining battery under § 1605A as "intending to cause a harmful or offensive contact" where "a harmful contact . . . resulted") (internal quotations omitted); *compare District of Columbia v. Chinn*, 839 A.2d 701, 705 (D.C. 2003) (defining assault as "an intentional and unlawful attempt or threat, either by words or acts, to do physical harm"), *with Murphy*, 740 F. Supp. 2d at 73 (holding that assault under §1605A is "intending to cause a harmful contact" where victims "[are] thereby put in such imminent apprehension") (internal quotations omitted); *compare Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984) (setting forth elements of intentional infliction of emotional distress as (1) extreme and outrageous conduct on part of defendant which (2) intentionally or recklessly (3) causes plaintiff severe emotional distress), *with Murphy*, 740 F. Supp. 2d at 74 (articulating scope of §1605A intentional infliction of emotional distress as reaching "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another"). Plaintiffs have thus established theories of recovery under § 1605A.

    **4.**    **Jurisdiction**

The Court has determined that it may exercise jurisdiction over defendants in this action, and that plaintiffs are seeking monetary compensation. *See supra* Section IV.A. This element is thus satisfied, and defendants may be held liable under the federal cause of action provided by § 1605A for the suicide bombing of Egged bus 36 and the resulting injuries to Seth Haim.

V.     DAMAGES

Here, plaintiffs seek compensatory and punitive damages. Complaint at 9. However, plaintiffs previously obtained an award in *Haim I*; specifically, Seth Haim received $11 million, Bernard Haim received $3.5 million, and Lavi Haim received $1.5 million in compensatory damages. 425 F. Supp. 2d at 76. "[I]t 'goes without saying that the courts can and should preclude double recovery by an individual.'" *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 333 (1980)). This principle prevents a plaintiff from receiving damages that exceed actual losses by either bringing several actions or articulating multiple theories of recovery concerning the same event. Following this general rule, this Court has previously concluded that "plaintiffs who obtain compensatory damages from a suit brought pursuant to former § 1605(a)(7) . . . may not obtain additional compensatory relief as a remedy to the federal cause of action in § 1605A where that subsequent suit arises out of the same terrorist act." *Beer II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *45–46. This holding—equally applicable here—prevents plaintiffs from obtaining any compensatory relief. Thus, the only issue before the Court is the request for punitive damages.

"Punitive damages, only recently made available under the revised FSIA terrorism exception, serve to punish and deter" actors from committing the acts for which they are imposed. *Valore*, 700 F. Supp. 2d at 87 (citing *In re Terrorism Litig.*, 659 F. Supp. 2d at 61). FSIA courts evaluate four factors—"(1) the character of the defendants' act, (2) the nature and extent of the harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of defendants," *id.* (citing *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 30 (D.D.C. 2008))—to calculate an appropriate punitive sanction. Historically, the use of these factors has resulted in a procedure for determining punitive

damages in which a FSIA court estimates the defendant foreign state's financial support for terrorism, and then multiplies that estimate by a multiplier (generally between 3 and 5.) *See, e.g.*, *Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 30 (D.D.C. 2009) ("[T]he Court chooses to take the mean of the range's two extremes ($50 million and $150 million) and multiply it ($100 million) by three. The result, as an award of $300 million, appears fitting."). This process frequently results in punitive damages awards against Iran in amounts between $300 and $400 million, *Beer II*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 129953 at *47— an amount plaintiffs describe as the "'standard' punitive damage award[]" under the FSIA's state-sponsored terrorism exception. Motion for Default Judgment at 8.

In a decision released today, this Court confronted the question of whether this method for calculating damage awards in FSIA actions remains viable in light of developing Supreme Court jurisprudence on punitive damages. Specifically, this Court addressed two questions: "First, do the limitations on punitive damage awards articulated by the Supreme Court under the Due Process Clause of the Fourteenth Amendment apply with equal force in this context? Second, does the extension of these constraints to general maritime law by the *Exxon* Court necessitate further extension of these same principles to FSIA suits?" Memorandum Opinion 8, *Beer v. Islamic Republic of Iran*, No. 08 Civ. 1807, May 19, 2011, [31]. As to the former issue, under clear D.C. Circuit precedent, "any constraints on punitive damages that may be found in the Fifth Amendment['s Due Process Clause] cannot be relied upon by a foreign sovereign." *Id*. at 12. Thus, this Court declined to "cross the constitutional Rubicon to extend Due Process protections against punitive damage awards to foreign states," as such an act "would undermine both international and domestic law by extending citizen's safeguards to foreign powers in the face of a clear determination by the Legislative and Executive branches that foreign sovereigns

and their instrumentalities—where engaged in terrorism—*should* be subject to such punitive sanctions." *Id*. at 12–13.

With respect to whether FSIA courts are required to extend punitive damage principles grounded in Due Process to these cases in light of the Supreme Court's extension of those principles to general maritime law, this Court articulated three reasons why they should not. First, it explained that the field of admiralty law is a unique area of law in which the federal courts' special role as purveyors of the law obligated the Supreme Court in *Exxon* to "fashion governing principles without consideration of other legal contexts," *id*. at 14, and that, "mindful of the special context in which *Exxon* was articulated," this Court is "not prepared to affect a sea-change in the law governing the assessment of punitive damages under federal statutes or federal common law generally." *Id*. at 15. Second, the *Beer* Court explained that Congress had been aware of both emerging Supreme Court doctrine on punitive damages and the established method for their calculation in FSIA cases prior to its enactment of the NDAA, and that its choice to provide for punitive damages in that Act using the same language that had previously controlled the question constituted an implicit approval of the traditional framework. *See generally id*. at 15–18. Finally, this Court contrasted the context involved in cases arising under the state-sponsored terrorism exception—which involve heinous and evil acts—with the case in *Exxon*—which involved mere recklessness—and concluded that it is "beyond the pale that the Supreme Court would countenance similar restrictions on the institution of punitive sanctions in response to acts of terrorism that impose a sentence of death or horrific physical and psychological injury on victims, a lifetime of unimaginable grief on loved ones, and immeasurable sorrow on the whole of humanity." *Id*. at 18–19. Based on these rationales, along with its earlier determination that Due Process principles play no role in limiting punitive

damages in terrorism-related FSIA suits, this Court held that the established procedure "for the calculation of punitive damage awards in FSIA cases should continue to govern cases arising from the atrocities of state-sponsored terrorism." *Id*. at 19.

The Court now turns to applying the established procedure in this case. The first step in this method is to estimate defendants' annual support for international terrorism. Here, plaintiffs request that the Court take judicial notice of Dr. Clawson's estimates of defendants' annual support—which place the relevant figure at approximately $100 million—to calculate punitive damages. Motion for Default Judgment at 9–10. Using this figure and the typical multiplier of 3, the Court finds no reason to deviate from standard practices concerning punitive damages under the state-sponsored terrorism exception to the FSIA, which are designed to provide optimal sanctions and deter future tragedies. The Court will award $300 million in punitive damages, to be distributed in proportion to each plaintiff's share of the compensatory award.

## VI. CONCLUSION

Seth Haim's life—and the lives of his family—were irreversibly changed on April 9, 1995. For several years, Seth and his family have sought to hold defendants Iran and MOIS accountable for their utterly irresponsible support of the Shaqaqi Faction—support that has repeatedly led to heinous and malicious acts of terrorism that killed and injured numerous civilians. Today the Court joins with the Haim family in hoping that these substantial punitive sanctions, combined with the prior compensatory awards (which cannot begin to replace what Seth lost many years ago), will help play a measurable role in preventing such tragic events in the future.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on May 19, 2011.