**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Seth Charles Ben Haim, *et al.*,     ) | |
|        ) | |
| Plaintiffs,     ) | |
|        ) | |
| v.     ) | CIVIL ACTION NO. 08-520-RCL |
|        ) | |
| The Islamic Republic of Iran, *et al.*,     ) | |
|        ) | |
| Defendants.     ) | |
|        ) | |
|        ) | |

**MEMORANDUM IN SUPPORT OF NON-PARTY ICANN'S MOTION TO**
**QUASH WRITS OF ATTACHMENT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

BACKGROUND FACTS ............................................................................................... 2

APPLICABLE LAW ...................................................................................................... 9

ARGUMENT ................................................................................................................ 10

    A.    ccTLDS ARE NOT PROPERTY SUBJECT TO ATTACHMENT ................... 10

    B.    ccTLDS ARE NOT "OWNED" BY THE COUNTRIES TO WHICH
        THEY ARE ASSIGNED ...................................................................................... 13

    C.    THE RELEVANT ccTLDS ARE NOT WITHIN THE DISTRICT OF
        COLUMBIA, OR EVEN THE UNITED STATES ........................................... 16

    D.    EVEN IF THESE ccTLDS CAN BE CONSIDERED "PROPERTY IN
        THE UNITED STATES OF A FOREIGN STATE," THIS COURT
        LACKS JURISDICTION TO ISSUE THEIR ATTACHMENT UNDER
        THE FSIA ............................................................................................................ 17

    E.    ICANN DOES NOT HAVE THE UNILATERAL POWER OR
        AUTHORITY TO RE-DELEGATE THE ccTLDS, AND DOING SO
        WOULD INTERFERE WITH CONTRACTUAL RELATIONSHIPS ............. 18

    F.    FORCED RE-DELEGATION OF THESE ccTLDS WOULD DESTROY
        THE VALUE OF THE ccTLDS, THE RIGHTS OF DOMAIN NAME
        HOLDERS IN THESE ccTLDS, AND JEOPARDIZE THE MANNER IN
        WHICH INTERNET OPERATES .................................................................... 20

CONCLUSION .............................................................................................................. 22

## TABLE OF AUTHORITIES

Page

CASES

*A.C.A. Am. Masters, Inc. v. Wertz,*
  45 A.D.2d 838, 358 N.Y.S.2d 445 (N.Y. App. Div. 1974 ....................................15

*Af-Cap, Inc. v. Republic of Congo,*
  383 F.3d 361 (5th Cir. 2004) ...............................................................................18

*\*Alderson v. United States,*
  686 F.3d 791 (9th Cir. 2012) ...............................................................................14

*Alexandria Surveys Int'l, LLC v. Alexandria Consulting Group, LLC,*
  500 B.R. 817 (E.D. Va. 2013).............................................................................12

*Allsbrook v. Azalea Radiator Serv., Inc.,*
  227 Va. 600, 316 S.E.2d 743 (Va. 1984)............................................................15

*Allstate Sales & Leasing Co., Inc. v. Geis,*
  412 N.W.2d 30 (Minn. Ct. App. 1987).................................................................16

*Argentine Republic v. Amerada Hess Shipping Corp.,*
  488 U.S. 428 (1989).............................................................................................17

*Arkansas City v. Anderson,*
  12 Kan. App. 2d 490, 749 P.2d 505 (Kan. Ct. App. 1988)....................................12

*Baker v. Bennett,*
  644 So. 2d 901 (Ala. 1994).................................................................................16

*Baltimore & Ohio R.R. v. Wheeler,*
  18 Md. 372 (1862) ..............................................................................................20

*Bunkers Int'l Corp. v. Carreirs Pitti, P.C.,*
  No. 1:11CV803, 2012 U.S. Dist. LEXIS 40332 (E.D. Va. Mar. 22, 2012)............14

*Citizens State Bank v. Caney Invs.,*
  733 S.W.2d 581 (Tex. Ct. App. 1987) ................................................................15

*Consumers United Ins. Co. v. Smith,*
  644 A.2d 1328 (D.C. 1994) ...................................................................................9

# TABLE OF AUTHORITIES
**(continued)**

Page

*Corzo v. Banco Central De Reserva Del Peru,*
   243 F.3d 519 (9th Cir. 2001) ............................................17

*\*Dorer v. Arel,*
   60 F. Supp. 2d 558 (E.D. Va. 1999) ....................................11

*E-Systems., Inc. v. Islamic Republic of Iran,*
   491 F. Supp. 1294 (N.D. Tex. 1980) ..............................14, 19

*\*Estate of Heiser v. Islamic Republic of Iran,*
   885 F. Supp. 2d 429 (D.D.C. 2012) ....................................14

*FG Hemisphere Assocs., LLC v. Republique du Congo,*
   455 F.3d 575 (5th Cir. 2006) ............................................17

*Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee Corp.,*
   921 F. Supp. 1113 (S.D.N.Y. 1996)....................................16

*Flatow v. Islamic Republic of Iran,*
   76 F. Supp. 2d 16 (D.D.C. 1999) ......................................18

*Fortune v. Evans,*
   58 A.2d 919 (D.C. 1948) ................................................21

*Gavilanes v. Matavosian,*
   123 Misc. 2d 868, 475 N.Y.S.2d 987 (N.Y. City Civ. Ct. 1984)............................16

*\*GlobalSantaFe Corp. v. GlobalSantaFe.com,*
   250 F. Supp. 2d 610 (E.D. Va. 2003) ..................................17

*Granite Constr. Co. v. United States,*
   962 F.2d 998 (Fed. Cir. 1992)..........................................21

*Hoffman Chevrolet, Inc. v. Washington Cnty. Nat'l Sav. Bank,*
   297 Md. 691 (Md. 1983)................................................19

*ICC Performance Ltd. P'ship v. Chiota,*
   No. CV 96338273, 1997 Conn. Super. LEXIS 2419 (Conn. Super. Ct. Sept. 10, 1997) ..............................................................15

*In re Estate of Ferdinand E. Marcos Human Rights Litig.,*
   No. 97C0477, 1997 WL 428544 (N.D.Ill. July, 24, 1997) ..................................16

## TABLE OF AUTHORITIES
### (continued)

Page

*In re Forchion*,
   198 Cal. App. 4th 1284 (2011) .......................................................................... 12

*In re StarNet, Inc.*,
   355 F.3d 634 (7th Cir. 2004) (Easterbrook, J.) ................................................... 11

*Kaiser Aetna v. United States*,
   444 U.S. 164 (1979) ............................................................................................ 14

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
   313 F.3d 70 (2d Cir. 2002) ................................................................................. 14

*Lappas v. Brown*,
   335 Pa. Super. 108, 483 A.2d 979 (Pa. Super. Ct. 1984) ................................... 15

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
   194 F.3d 980 (9th Cir. 1999) .............................................................................. 11

*Mac Panel Co. v. Virginia Panel Corp.*,
   283 F.3d 622 (4th Cir. 2002) .............................................................................. 20

*Milberg Factors, Inc. v. Hurwitz-Nordlicht Joint Venture*,
   676 S.W.2d 613 (Tex. Ct. App. 1984) ................................................................ 15

*Mones v. Commercial Bank of Kuwait*,
   399 F. Supp. 2d 310 (S.D.N.Y. 2005) ................................................................ 16

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Emp't Concepts, Inc.*,
   269 A.D.2d 101, 703 N.Y.S.2d 3 (N.Y. App. Div. 2000) ................................... 16

*NBC Universal, Inc. v. NBCUNIVERSAL.com*,
   378 F. Supp 2d 715 (E.D. Va. 2005) .................................................................. 17

*Network Solutions, Inc. v. Umbro International, Inc.*,
   529 S.E.2d 80 (Va. 2000) .............................................................................. 11, 12

*North v. Peters*,
   138 U.S. 271, 11 S. Ct. 346, 34 L. Ed. 936 (1891) ............................................ 21

*Novak v. Benn*,
   896 So. 2d 513 (Ala. App. Ct. 2004) .................................................................. 12

## TABLE OF AUTHORITIES
### (continued)

Page

*Pacific Decision Scis. Corp. v. Superior Court,*
  121 Cal. App. 4th 1100, 18 Cal. Rptr. 3d 104 (2004)............................................16

*Perfect 10, Inc. v. Amazon.com, Inc.,*
  508 F.3d 1146 (9th Cir. 2007) ..................................................................................3

*\*Peterson v. Islamic Republic of Iran,*
  938 F. Supp. 2d 93 (D.D.C. 2013)..........................................................................14

*Peterson v. Islamic Republic of Iran,*
  Case No. 1:01-cv-02094 (RCL), Dkt. No. 375 (D.D.C. July 7, 2008) ....................9

*\*Petrie v. Wyman,*
  35 N.D. 126, 159 N.W. 616 (N.D. 1916) explained ...............................................19

*Phillips v. Sugrue,*
  886 F. Supp. 63 (D.D.C. 1995)...............................................................................19

*Prestige Wine & Spirits, Inc. v. Martel,*
  680 F. Supp. 743 (D. Md. 1988) .............................................................................16

*Reich v. Spiegel,*
  208 Misc. 225, 140 N.Y.S.2d 722 (N.Y. Sup. Ct. 1955) ........................................15

*Richion v. Mahoney,*
  62 Cal. App. 3d 604, 133 Cal. Rptr. 262 (1976)....................................................14

*Rochford v. Laser,*
  91 Ill. App. 3d 769 (Ill. Ct. App. 1980) .................................................................12

*Sara Lee Corp. v. Gregg,*
  No. 1:02CV00195, 2002 WL 1925703 (M.D.N.C. Aug. 15, 2002) ........................16

*SBA v. XACT Telesolutions, Inc.,*
  No. DKC 2005-1230, 2006 U.S. Dist. LEXIS 621 (D. Md. Jan. 10, 2006) ...........21

*\*Size, Inc. v. Network Solutions, Inc.,*
  255 F. Supp. 2d 568 (E.D. Va. 2003) .....................................................................12

*United States ex rel. Global Bldg. Supply, Inc.v. Harkins Builders, Inc.,*
  45 F.3d 830 (4th Cir. 1995) ....................................................................................12

**TABLE OF AUTHORITIES**
(continued)

Page

*Ward v. Desert Eagle, LLC*,
    No. 2:06-cv-00938-RCJ-LRL, 2010 WL 455089 (D. Nev. Feb. 2, 2010)..............................14

*Wave Maker Shipping Co. v. Hawkspere Shipping Co.*,
    56 F. App'x 594 (4th Cir. 2003) ...........................................................14

STATUTES

28 U.S.C. §§ 1603 *et seq*...................................................................17, 18

28 U.S.C. § 1609....................................................................................17

28 U.S.C. § 1610(a) ..............................................................................18

D.C. Code § 15-101(a)(2) ......................................................................1

D.C. Code § 16-544 ..........................................................................10, 13

OTHER AUTHORITIES

6 Am. Jur. 2d 766, Attachment and Garnishment, § 124..................................16

7 C.J.S. Attachment § 65 (1980)...............................................................16

Fed. R. Civ. P. 69 ...................................................................................1

Fed. R. Civ. P. 69(a) ..........................................................................9, 16

Fed. R. Civ. P. 69(a)(1)..........................................................................9

Restatement (Second) of Conflict of Laws § 67(b) ....................................16

Pursuant to Rule 69 of the Federal Rules of Civil Procedure, Title 16, Chapter 5 of the

District of Columbia Official Code, and Rule 69-I of the District of Columbia Superior Court

Rules of Civil Procedure, non-party Internet Corporation for Assigned Names and Numbers

("ICANN") hereby moves to quash Writs of Attachment on Judgment Other Than Wages, Salary

And Commissions ("Writs of Attachment") issued by Plaintiffs in the above-entitled action.[1]

## INTRODUCTION

It is with great sympathy for Plaintiffs' underlying claims and injuries that ICANN files

this Motion to Quash Plaintiffs' Writs of Attachment.  ICANN is a public benefit nonprofit

corporation organized under the laws of California.  As the U.S. Government established back in

1998, when ICANN was created, ICANN's mission is to coordinate and administer the system of

unique identifiers that allow computers and other devices to communicate over the Internet.  One

of the key identifier systems is known as the Internet's Domain Name System ("DNS").  The

DNS provides a human interface to the Internet Protocol ("IP") addressing system by converting

numeric IP addresses into more easily-remembered sets of characters and numbers referred to as

"domain names."  ICANN's activities are critical to supporting the single, global and

interoperable Internet the world has come to rely on for the rapid exchange of ideas, information

and communications.

ICANN's role as the global coordinator of the DNS at the top level, and the legitimacy of

ICANN's multi-stakeholder approach to policy development and implementation, is tied to the

global Internet community's expectations that ICANN act in an evenhanded and impartial

---

[1] Plaintiffs issued to ICANN writs of attachment in seven actions: (1) *Rubin, et al. v. Islamic Republic of Iran, et al.*, Case No. 01-1655-RMU; (2) *Haim, et al. v. Islamic Republic of Iran, et al.*, Case No. 02-1811-RCL; (3) *Haim, et al. v. Islamic Republic of Iran, et al.*, Case No. 08-520-RCL; (4) *Stern, et al. v. Islamic Republic of Iran, et al.*, Case No. 00-2602-RCL; (5) *Weinstein, et al. v. Islamic Republic of Iran, et al.*, Case No. 00-2601-RCL; (6) *Wyatt, et al. v. Syrian Arab Republic, et al.*, Case No. 08-502-RCL; and (7) *Calderon-Cardona, et al. v. Democratic People's Republic of North Korea, et al.*, Case No. 14-mc-648-RCL.  ICANN has filed the identical Motion to Quash in all seven actions.  The only distinction between these cases relates to the *Weinstein* action, in which the judgment Plaintiffs are seeking to enforce was issued on February 6, 2002 (ECF No. 23) and is therefore no longer enforceable.  D.C. Code § 15-101(a)(2) (mandating that money judgments are enforceable for up to twelve years).  This is an independent basis to grant ICANN's Motion to Quash in the *Weinstein* case.

manner.  As the impartial, global coordinator of the DNS, and with this Motion to Quash, ICANN seeks to halt Plaintiffs' efforts to attach what cannot be attached.

Plaintiffs hold several money judgments against the governments of Iran, Syria and North Korea (collectively, the "defendants").  Plaintiffs endeavor, with the Writs of Attachment, to attach the .IR, .SY and .KP country code top-level domains ("ccTLDs"), related non-ASCII ccTLDs, and supporting IP addresses (collectively, the ".IR, .SY and .KP ccTLDs"), all of which represent a space on the Internet for use by the citizens of Iran, Syria and North Korea.  But ICANN holds no property to attach and ICANN does not have the authority or capability to effectuate a "transfer" of the .IR, .SY and .KP ccTLDs to anyone, including Plaintiffs.

Well-established legal principles dictate that the .IR, .SY and .KP ccTLDs are not subject to attachment, for multiple reasons.  First, a ccTLD simply is not "property" subject to attachment.  Second, although operating for the benefit of the people of Iran, Syria and North Korea, respectively, the relevant ccTLDs are not "owned" by the defendants or anyone else, for that matter.  Third, the .IR, .SY and .KP ccTLDs are not "located" in the District of Columbia or even the United States, and therefore are beyond the reach of Plaintiffs' Writs of Attachment.  Fourth, even if these ccTLDs could be characterized as "property in the United States of the defendants," this Court would lack jurisdiction over these proceedings, according to the Foreign Sovereign Immunities Act.  Fifth, ICANN does not unilaterally have the capability or authority to transfer the .IR, .SY or .KP ccTLDs to Plaintiffs.  Finally, a forced transfer of the .IR, .SY and .KP ccTLDs would destroy whatever value may exist in these ccTLDs, would wipe out the hundreds of thousands of second-level domain names registered therein by various individuals, businesses and charitable organizations, and could jeopardize the single, global, interoperable structure the Internet.  For these reasons, individually and collectively, Plaintiffs' Writs of Attachment must be quashed.

## BACKGROUND FACTS

**The Internet, Its Domain Name System and Top Level Domains.**  "The Internet is a world-wide network of networks . . . all sharing a common communications technology."

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1155 (9th Cir. 2007).  The global Internet has remained stable, secure and interoperable because of the standardized administration of this "communications technology," which is known as the Internet's "DNS."

Computers find one another over the Internet by using IP addresses, which are strings of numbers separated by periods, such as "192.0.34.163."  (Declaration of John O. Jeffrey ("Jeffrey Decl."), ¶ 3.)  An IP address, each of which must be unique, just like a street address or telephone number, is a numerical identifier of a particular source of data on the Internet, such as a website.  (*Id.*)  For example, computers attempting to connect with this Court's website identify the website as "63.124.22.40."

But because it is difficult to remember long lists of numbers, the DNS provides a human interface to the IP system by converting the numeric IP addresses into more easily-remembered "domain names."  (*Id.*)  The end result is that Internet users can find this Court's website by typing "DCD.USCOURTS.GOV" into their Internet browsers, rather than trying to remember "63.124.22.40."

A domain name can be viewed as being made up of at least two elements – what is before and after the last "dot."  (*Id.* at ¶ 4.)  The part to the right of the last dot, such as "COM," "GOV" or "US" is known as a "top-level domain" or "TLD."  (*Id.*)  The part of a domain name before the last dot, such as "USCOURTS" in USCOURTS.GOV, is the word or phrase that individuals and entities register as second-level domain names in those TLDs, which are then used to identify online websites and email addresses.  (*Id.*)  In essence, a TLD operates as a phone book that contains the links between unique IP addresses and the unique domain names that are registered within that TLD.

Needless to say, proper administration and coordination of the DNS is critical in today's world.  ICANN is at the core of this administration.

**ICANN – A Complex Organization with a Unique Mandate.**  Prior to ICANN's formation in 1998, the U.S. Government, via contractual arrangements with third parties, administered the DNS.  (*Id.* at ¶ 5.)  ICANN was formed in 1998 as part of the U.S.

- 3 -

Government's commitment to, among other things, privatize the Internet so that administration of the DNS would be in the hands of those who actually use the Internet as opposed to governments.  (*Id*.)  ICANN's mission is to protect the stability, integrity, interoperability and utility of the DNS on behalf of the global Internet community.  (*Id*.; Declaration of Eric P. Enson ("Enson Decl."), ¶ 2, Ex. A at Art. I, § 1 (ICANN's Bylaws).)

ICANN is a complex organization that facilitates input from a wide variety of stakeholders from around the globe.  ICANN has an international Board of Directors, approximately 300 staff members, and an Ombudsman.  (Jeffrey Decl., ¶ 6.)  The ICANN community is made up of thousands of stakeholders and approximately 140 governments involved in setting and advising on policy, and providing technical coordination functions of the Internet.  (*Id*.)  The community is organized through three Supporting Organizations, four Advisory Committees, a group of technical expert advisors, a Nominating Committee, and a large, globally distributed group of community members who participate in ICANN's processes. (*Id*.)  ICANN is much more than just a California public benefit nonprofit corporation – it is a community of thousands of participants coming together to set policies, including those for second-level and top-level domain names.

One of the ways that ICANN fulfills it administrative role is by approving qualified entities for the responsibility of operating the Internet's TLDs.  (*Id*. at ¶ 7.)  These entities, which are usually referred to as "Registry Operators," are tasked with managing the definitive list of domain names registered within the TLD they manage.  (*Id*.)  There are a number of long-standing "generic" TLDs, such as .COM, .NET and .ORG, and ICANN is currently in the process of evaluating hundreds of applications for new generic TLDs, several hundred of which have already been delegated into the DNS.  (*Id*. at ¶¶ 7, 10.)  To ensure that these generic TLDs remain stable and operable around the globe, ICANN enters into comprehensive contracts with the generic TLD Registry Operators that set forth the parties' obligations and duties.  (*Id*. at ¶ 10.)

In addition, and relevant here, there are more than 280 country code TLDs ("ccTLDs") in operation, such as .US for the United States, .JP for Japan and the three at issue in this matter, .IR for Iran, .SY for Syria and .KP for North Korea.  (*Id.* at ¶ 11.)  As discussed below, ccTLDs and ICANN's relationship with the organizations that run the ccTLDs, are quite different from the generic TLDs mentioned above.

**ICANN's IANA Functions.**  Another way that ICANN fulfills its administrative role is by performing what are known as the Internet Assigned Numbers Authority ("IANA") functions. Since 2000, ICANN has performed the IANA functions pursuant to an "IANA Functions Contract" with the United States Department of Commerce ("DOC").  (*Id.* at ¶ 8; Enson Decl., ¶ 3, Ex. B (IANA Functions Contract).)  The most-recent IANA Functions Contract was entered into in 2012, and remains in effect today.  (*Id.*)

One of the IANA functions ICANN performs is maintaining the technical and administrative details of the DNS's "Root Zone Database," used to compile the Root Zone of the Internet, which is the authoritative place to look up the network location of the more than 650 TLDs in operation today.  (Jeffrey Decl., ¶ 9.)  When a computer or device is establishing the location of a service on the Internet using its domain name, it may consult the Root Zone to determine that domain name's location.  (*Id.*)  The Root Zone provides a referral to a list of servers that are dedicated to hosting the TLD that contains the requested domain name.  (*Id.*)  In other words, for the websites in a TLD to be accessible on the global Internet, the TLD must be "delegated," or connected, to the Root Zone Database.

Among other things, the IANA Functions Contract provides that ICANN process and make recommendations for changes to the Root Zone Database, such as a delegation of a new TLD or a re-delegation of an existing TLD to another Registry Operator.  (Enson Decl., ¶ 3, Ex. B at §§ C.2.9.2, C.2.9.2.a, C.2.9.2.c.)  But the IANA Functions Contract specifically ***forbids ICANN from authorizing or making any TLD delegation or re-delegation on its own***.  (*Id.* at §§  C.8.1, C.8.2, C.8.3.)  Only the U.S. Government can approve and facilitate implementation of any such alteration to the Root Zone Database.

**The Internet's ccTLDs.**  ccTLDs are generally used for websites and communications specific to a country or region.  (Jeffrey Decl., ¶ 11.)  In the early days of the Internet – before ICANN came into existence – ccTLDs were created for countries appearing on a list of nations prepared by the International Organization for Standardization in its ISO 3166-1 publication, using two-letter ASCII characters.  (Enson Decl., ¶ 4, Ex. C at ¶¶ 2, 3 (RFC 1591).)  More recently, internationalized domain name ("IDN") ccTLDs have been created, using non-ASCII characters, such as Arabic script or Chinese characters.  (Jeffrey Decl., ¶ 11.)

ccTLDs are administered by entities generally referred to as "ccTLD managers," that "perform[]a public service on behalf of the Internet community," both globally and in the country or territory designated by the country code.  (Enson Decl., ¶ 4, Ex. C at ¶ 2.)  Each recognized ccTLD manager is recorded in the Root Zone Database along with an administrative contact and a technical contact.  (Jeffrey Decl., ¶ 12.)  Rules for evaluating and certifying ccTLD managers have been established by processes, standards and principles developed by the Internet community and documented in several publications like those set forth below, as well as others.  (*Id*.)

A key requirement of a ccTLD manager is to demonstrate that it has the "technical and administrative ability . . . to operate the domain competently and that they will not jeopardize nor compromise the stability and security of the DNS."  (Enson Decl., ¶ 5, Ex. D (ICANN's Delegating or Redelegating a ccTLD); Enson Decl., ¶ 4, Ex. C at ¶ 3; Jeffrey Decl., ¶ 12.)  Each ccTLD is required to have a technical contact and an administrative contact.  (Enson Decl., ¶ 3, Ex. C at ¶ 3 (1); Jeffrey Decl., ¶ 12.)  The ccTLD managers, administrative contacts and technical contacts are required to reside in the country represented by the ccTLD.  (*Id*.; Enson Decl., ¶ 5, Ex. D; Jeffrey Decl., ¶ 12.)  In addition, a ccTLD manager must demonstrate that its operations will serve the country's local Internet community's interests and that involved parties and governments have considered and consent to the ccTLD manager's operations.  (Jeffrey Decl., ¶ 12.)  But while government support for a ccTLD manager is important, government

- 6 -

approval of a particular ccTLD manager is not necessarily required.  (Enson Decl., ¶ 6, Ex. E at

p. 2 (Common Questions on Delegating and Redelegating ccTLDs).)

The duties and limits placed on ICANN's performance of the IANA Functions Contract

are found in a release that ICANN published in May 1999, which is generally referred to as

"ICP-1" and describes the key principles for the delegation and re-delegation of TLDs, including

ccTLDs.  (Enson Decl., ¶ 7, Ex. F (ICP-1).)[2]  ICP-1 first notes that "[c]oncerns about 'rights' or

'ownership' of [ccTLDs] is inappropriate.  It is appropriate, however, to be concerned about

'responsibilities' and 'service' to the community."  (*Id.* at ¶ (b).)  Second, pursuant to the IANA

Functions Contract, and the standards set forth in ICP-1, ICANN makes ***recommendations*** to the

DOC regarding alterations to the Root Zone, such as the change of a ccTLD manager or a ccTLD

contact, but, as noted above, the IANA Functions Contract provides that ICANN ***cannot***

***authorize*** any of these changes on its own – as that would constitute an improper re-delegation

of the ccTLD – and ICANN lacks the technical capability to do so, in any event.  (Enson Decl., ¶

5, Ex. D (with respect to delegation or re-delegation of ccTLDs, "[t]he U.S. Department of

Commerce, as the Root Zone Administrator, is responsible for verifying that processing

procedures have been followed, and authorising any related changes to the DNS root zone and

root zone database.").)

Shortly after ICANN was created, it sought to formalize its expectations of many of the

ccTLD managers.  (Jeffrey Decl., ¶ 13.)  To this end, ICANN has entered into simple letter

exchanges or memoranda of understanding with some ccTLD managers that generally document

their technical responsibilities to ensure the security, stability and resiliency of the Internet.  (*Id.*)

Some ccTLD managers make contributions to ICANN to defray ICANN's costs of operations,

but these contributions are on a voluntary, non-mandatory basis.  (*Id.*)  There are, however, a

number of ccTLD managers with which ICANN:  (1) has no agreement; and (2) from which

---

[2] ICP-1 was published shortly after ICANN was created as a codification of RFC 1591, which is a set of standards for the DNS structure and the delegation of TLDs within that structure, including ccTLDs, drafted by the founders of the modern Internet.  (Enson Decl., ¶ , Ex. C.)  The purpose of RFC 1591, as well as ICP-1, was to recognize that a formalized and orderly management of the DNS would ensure that it remain stable, secure and interoperable.

ICANN receives no contributions.  (*Id.*)  The managers for the .IR, .SY and .KP ccTLDs, and their related IDN ccTLDs, fall into both of these categories.  (*Id.*)

**The ".IR ccTLDs."**  Two ccTLDs are specifically designated to serve the people of Iran.  There is a long-standing .IR ccTLD, and the ايران. IDN ccTLD was created in 2013, representing the Arabic script equivalent of "Iran" in English (collectively, the ".IR ccTLDs").  (Enson Decl., ¶ 8, Ex. G (Report on the Delegation of the .IR IDN).)  The current manager for the .IR ccTLDs is the Institute for Research in Fundamental Sciences, which is located in Tehran, Iran.  (Enson Decl., ¶ 9, Ex. H (Delegation Record for .IR).)  The Administrative Contact is Siavash Shahshahani and the Technical Contact is Alireza Saleh, both located in Tehran.  (*Id.*)  There are three servers hosting the .IR ccTLDs, two servers are physically located somewhere in Iran and one apparently located in Austria.  (*Id.*)  Currently, there are approximately 530,000 second-level domain names registered in the .IR ccTLDs.  (Jeffrey Decl., ¶ 14.)

**The ".SY ccTLDs."**  Two ccTLDs are specifically designated to serve the people of Syria.  There is the .SY ccTLD, and the سورية. IDN ccTLD was created in 2010, representing the Arabic script equivalent of "Syria" in English (collectively, the ".SY ccTLDs").  (Enson Decl., ¶ 10, Ex. I (IDN ccTLD Fast Track String Evaluation Completion).)  The current ccTLD manager for the .SY ccTLDs is the National Agency for Network Services ("NANS"), which is located in Damascus, Syria.  (Enson Decl., ¶ 11, Ex. J (Delegation Record for .SY).)  The Administrative Contact is the "DNS  Department" of NANS and the Technical Contact is the "DNS Technical Department" of NANS, both located in Damascus.  (*Id.*)  There are four servers hosting the .SY ccTLDs, two servers appear to be physically located somewhere in Syria and it is unclear where the other two are located.  (*Id.*)

**The ".KP ccTLD."**  The .KP ccTLD is specifically designated to serve the people of North Korea (the ".KP ccTLD").  The current ccTLD manager for the .KP ccTLD is the Star Joint Venture Company, which is located in Pyongyang, North Korea.  (Enson Decl., ¶ 12, Ex. K (Delegation Record for .KP).)  The Administrative and Technical Contacts are listed as the "President" of the Star Joint Venture Company, located in Pyongyang.  (*Id.*)  There are two

- 8 -

servers hosting the .KP ccTLD, both appear to be physically located somewhere in North Korea. (*Id.*)

**ICANN's Interactions with the .IR, .SY and .KP ccTLD Managers.** Over the years, ICANN has had little interaction with the .IR, .SY and .KP ccTLD managers relating to the ccTLD's operations. (Jeffrey Decl., ¶ 15.) Each of these communications has been technical in nature, usually relating to a change in contact information or activation or de-activation of servers hosting the ccTLDs. (*Id.*) ICANN has never entered into any type of agreement relating to the .IR, .SY or .KP ccTLDs, and has never obtained funds or contributions relating to these ccTLDs. (*Id.* at ¶ 13, 16)

**Plaintiffs' Writs of Attachment.** On June 23, 2014, Plaintiffs issued to ICANN seven writs of attachment and subpoenas *duces tecum*. The Writs of Attachment do not identify any specific property of the defendants that Plaintiffs seek to attach. But a letter accompanying the Writs of Attachment states, and the subpoenas make clear, that Plaintiffs seek to attach the .IR, .SY and .KP ccTLDs, along with their IP addresses, in order to satisfy judgments against the defendants. Prior to the filing of this Motion to Quash, ICANN filed responses to the Writs of Attachment certifying, under oath, that ICANN is not indebted to the defendants in any way and that ICANN does not hold any "goods, chattels, or credits" of the defendants. Both factually and legally, ICANN's certification is accurate, and the Writs of Attachment should therefore be quashed.

## APPLICABLE LAW

Under Federal Rule of Civil Procedure 69(a), the propriety of an attachment is governed by District of Columbia law. *See* Fed. R. Civ. P. 69(a)(1) ("The procedure on execution-and in proceedings supplementary to and in aid of a judgment or execution-must accord with the procedure of the state where the court is located . . . ."). A court's ability to order attachment is limited to the delivery of property that belongs to a judgment debtor but is being held by a third party. *See Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1352 (D.C. 1994). And a motion to quash is an appropriate vehicle for raising deficiencies in a writ of attachment.

- 9 -

*Peterson v. Islamic Republic of Iran*, Case No. 1:01-cv-02094 (RCL), Dkt. No. 375 (D.D.C. July 7, 2008).

## ARGUMENT

Plaintiffs' Writs of Attachment should be quashed on a number of independent grounds because ICANN simply has nothing that can be attached: (1) the .IR, .SY and .KP ccTLDs are not "property" subject to attachment; (2) the relevant ccTLDs, and their IP addresses, are not "owned" by the defendants; (3) these ccTLDs are not "located" in the District of Columbia or even the United States; (4) even if these ccTLDs could be characterized as "property in the United States of a foreign state," this Court would lack jurisdiction over these proceedings, according to the Foreign Sovereign Immunities Act ("FSIA"); (5) ICANN cannot unilaterally re-delegate or transfer these ccTLDs to anyone, and an order to do so would disrupt contractual relationships; and (6) forced re-delegation of these ccTLDs would destroy whatever value may exist in these ccTLDs, would wipe out the hundreds of thousands of domain name registrations in the ccTLDs, and could lead to fragmentation of the Internet. For any one or all of these reasons, Plaintiffs' Writs of Attachment must be quashed.

### A.     ccTLDS ARE NOT PROPERTY SUBJECT TO ATTACHMENT.

Under District of Columbia law, attachment proceedings must be directed at "property," which is defined as a "judgment debtor's goods, chattels, and credits." D.C. Code § 16-544. A ccTLD is not property. A ccTLD cannot be physically held, it is not capable of a precise definition because it is constantly changing as new domain names are added and deleted, there is no established market within which a ccTLD can be purchased or sold, and a ccTLD holds no intrinsic value. Moreover, a ccTLD, by itself, has no functional utility without all the routing and administrative services – provided by the ccTLD manager and members of the Internet technical community – that accompany and support its use.

A ccTLD is simply a two-letter code (or related non-ASCII equivalent), corresponding to a particular country, which is used to help organize the registry of second-level domain names registered within the top-level domain. If a specific domain name can be analogized to a street

address, a ccTLD can be thought of as a zip code.  That zip code may encompass many different addresses, and those addresses in turn may correspond to certain places on the Internet that people can access, such as websites.  But the street address itself is not property, nor is the zip code in which the street address exists.  Rather, a ccTLD simply identifies for computers the general vicinity of the Internet in which a specific address and information is located.  *Cf. In re StarNet, Inc.*, 355 F.3d 634, 637 (7th Cir. 2004) (Easterbrook, J.) ("No one has a property interest in a phone number.").

To the extent a ccTLD is capable of a legal definition, it is a collection of technical and administrative services, rather than property.  This is precisely what the Ninth Circuit found in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999).  There, the court was called on to determine whether the .COM TLD was a "product" or a "service," and the court ruled that the TLD fell "squarely on the 'service' side of the product/service distinction." *Id*. at 984.  As the Ninth Circuit correctly analogized, "NSI's role [as the manager of .COM] differs little from that of the United States Postal Service:  when an Internet user enters a domain-name combination, NSI translates the domain-name combination to the registrant's IP address and routes the information or command to the corresponding computer . . . NSI does not supply the domain-name combination any more than the Postal Service supplies a street address." *Id.* at 984-85.

Likewise, in assessing whether domain names – which are listed within the Internet's TLDs – can be considered "property," numerous courts from various jurisdictions have found that they cannot.  For instance, in *Dorer v. Arel*, 60 F. Supp. 2d 558, 560 (E.D. Va. 1999), the Eastern District of Virginia found – in judgment execution proceedings – that "there are several reasons to doubt that domain names should be treated as personal property subject to judgment liens."  Chief among these reasons is that "a domain name registration is the product of a contract for services between the registrar and registrant . . . Thus, a judgment debtor 'owns' the domain name registration in the same way that a person 'owns' a telephone number." *Id*. at 561. In *Network Solutions, Inc. v. Umbro International, Inc.*, 529 S.E.2d 80, 86 (Va. 2000), the

- 11 -

Virginia Supreme Court ruled that domain names are not garnishable because the right to their use "is inextricably bound to the domain name services [the garnishee] provides."  As the *Network Solutions* court observed, and particularly relevant here:  "If we allow the garnishment of NSI's services in this case because those services create a contractual right to use a domain name, we believe that practically any service would be garnishable."  *Id.* at 86-87.  And in *Size, Inc. v. Network Solutions, Inc.*, 255 F. Supp. 2d 568, 573 (E.D. Va. 2003), the Eastern District of Virginia again found that a domain name is a contract for services, not property.  *See also In re Forchion*, 198 Cal. App. 4th 1284, 1308 (2011) ("a domain name is not property, but rather the product of a contract for services between the registrant and registrar.").

The reasoning in these cases applies even more forcefully to ccTLDs – a ccTLD is simply the provision of routing and administrative services for the domain names registered within that ccTLD; it is not property.  And because a ccTLD is a collection of critical and complex Internet services, a ccTLD is not attachable or property.  *Network Solutions*, 529 S.E.2d at 87 (ruling that attachment of a contract for services is impermissible); *Alexandria Surveys Int'l, LLC v. Alexandria Consulting Group, LLC*, 500 B.R. 817, 822 (E.D. Va. 2013) (approving and applying the ruling in *Network Solutions*).  Put another way, Plaintiffs may not use their Writs of Attachment to interject themselves into – or become party to – this complex web of services relating to technical matters, much less interfere with and disrupt them.  *United States ex rel. Global Bldg. Supply, Inc.v. Harkins Builders, Inc.*, 45 F.3d 830, 833, 835 (4th Cir. 1995) ("where the property is in the form of a contract right, the judgment creditor does not 'step in the shoes' of the judgment debtor and become a party to the contract, but merely has the right to hold the garnishee liable for the value of that contract."); *Arkansas City v. Anderson*, 12 Kan. App. 2d 490, 749 P.2d 505 (Kan. Ct. App. 1988) (creditors had right to take profits and proceeds that accrued to the debtors as partners, but not their right to control in the management of the partnership).  Because the services provided by ccTLDs are not transferable "property," the Writs of Attachment must be quashed.  *See Rochford v. Laser*, 91 Ill. App. 3d 769 (Ill. Ct. App.

1980) (ruling that seat on Chicago Merchantile exchange could not be attached because it was

not freely transferable); *see also Novak v. Benn*, 896 So. 2d 513, 521 n.1 (Ala. App. Ct. 2004).

Finally, any conclusion that a ccTLD is "property" would run contrary to both

authoritative Internet protocol standards and the views of governments around the world.

ICANN's ICP-1 publication, as well as RFC 1591, state in pertinent part:

> ***Concerns about "rights" and "ownership" of domains are
> inappropriate.***  It is appropriate, however, to be concerned about
> "responsibilities" and "service" to the community.

(Enson Decl., ¶ 7, Ex. F at § b (emphasis added); Enson Decl., ¶ 4, Ex. C at ¶ 2.)  In addition, a

number governments, including the United States government, have also addressed the issue of

whether ccTLDs are property and have all come out against any property rights inuring therein.

For example, a number of governments signed onto a set of principles in 2000 relating to

delegation and administration of ccTLDs including the principle that "No private intellectual ***or

other property rights*** should inhere in the ccTLD itself, nor accrue to the delegee as the result of

the management, administration or marketing of the ccTLD."  (Enson Decl., ¶ 13, Ex. L at

Clause 4.2 (Governmental Advisory Committee Principles for the Delegation and Administration

of ccTLDs (emphasis added)); *see also* Enson Decl., ¶ 14, Ex. M at ¶ 9.1.3 (Principles and

Guidelines for the Delegation and Administration of ccTLDs) (concluding that there should be

no claim of intellectual property rights in a ccTLD).)  Thus, there is a consensus among major

countries that no property rights exist in a ccTLD.

> **B.     ccTLDS ARE NOT "OWNED" BY THE COUNTRIES TO WHICH THEY
>         ARE ASSIGNED.**

The Writs of Attachment must also be quashed because, even if "property," these

ccTLDs are not owned by the defendants – any more than a city or neighborhood "owns" their

zip code.  D.C. Code § 16-544.  None of the defendants purchased the ccTLDs assigned to their

countries, and there is no established procedure authorizing the defendants to sell these ccTLDs.

Nor do the defendants have the power to order ICANN or any other entity to take any actions

- 13 -

with respect to the ccTLDs.  As stated in ICANN's ccTLD guidelines, Section 9.1.3, "the ccTLD is operated in ***trust in the public interest*** and that any claim of intellectual property rights in the two-letter code in itself shall not impede any possible future change of Registry."  (Enson Decl., ¶ 14, Ex. M at ¶ 9.1.3 (emphasis added); *see also* Enson Decl., ¶ 13, Ex. L at Clause 4.2.)  In fact, according to ICANN's rules and procedures, defendants do not possess the sole power to determine or control what entities will operate the ccTLDs assigned to their countries.  (Enson Decl., ¶ 6, Ex. E at p. 2.)

In addition, "[g]eneral principles of property law require that a property owner have the legal right to exclude others from use and enjoyment of that property."  *Alderson v. United States*, 686 F.3d 791, 796 (9th Cir. 2012); *see also Kaiser Aetna v. United States*, 444 U.S. 164, 179-80 & n.11 (1979) (holding that the right to exclude others from use is "a fundamental element of the property right").  Here, Plaintiffs cannot point to a contract, agreement, treaty, statute or court case providing defendants with a "legal right" to exclude others from the use and enjoyment of these ccTLDs.  Nor can Plaintiffs point to any evidence indicating that the defendants have attempted to assert such a legal right.  In fact, the entire premise of a ccTLD is that it ***will be used and enjoyed by many*** who choose to register, operate and visit domain names within that ccTLD.  The defendants' lack of ownership interest in the ccTLDs here is fatal to the Writs of Attachment.  *See Peterson v. Islamic Republic of Iran*, 938 F. Supp. 2d 93, 97 (D.D.C. 2013) (ruling that attachment of electronic funds transfers were inappropriate because Iran had no property interest in the ETFs); *Estate of Heiser v. Islamic Republic of Iran*, 885 F. Supp. 2d 429, 438 (D.D.C. 2012) (same); *Bunkers Int'l Corp. v. Carreirs Pitti, P.C.*, No. 1:11CV803 (LMB/IDD), 2012 U.S. Dist. LEXIS 40332, at *9-10 (E.D. Va. Mar. 22, 2012) (refusing to allow the attachment of an Internet domain name because the name was not registered to the defendant).[3]

---

[3] The rule is the same in other jurisdictions.  *See Wave Maker Shipping Co. v. Hawkspere Shipping Co.*, 56 F. App'x 594 (4th Cir. 2003); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002); *Ward v. Desert Eagle, LLC*, No. 2:06-cv-00938-RCJ-LRL, 2010 WL 455089, at *6 (D. Nev. Feb. 2, 2010); *E-Systems, Inc. v.*

Other established principles within the Internet community also refute any notion that a country "owns" the ccTLD assigned to it.  In 2000, the Governmental Advisory Committee, an independent group of governments that provide ICANN with public policy advice regarding ICANN's activities, agreed to another set of principles stating, among other things, that "[n]o private intellectual or *other property rights* should inhere in the ccTLD itself." (Enson Decl., ¶ 13, Ex. L at Clause 4.2).  And Clause 5 of these principles describes the governments' role as "represent[ing] the interests of the people of the county or territory for which the ccTLD has been delegated" (*id*. at ¶ 5.1), maintaining "responsibility for public policy objectives" and "ultimate policy authority" (*id*. at ¶ 5.2), and otherwise following "the general principle that the Internet naming system is a public resource in the sense that its functions must be administered in the public or common interest."  (*Id*. at ¶ 5.3).  A theory that these ccTLDs are property "owned" by the defendants runs contrary to these bedrock principles of the Internet.

And these are principles acknowledged by many of the ccTLD managers themselves.  In particular, numerous .ccTLD managers have publicly supported ICANN's ICP-1 and its

---

(continued…)

*Islamic Republic of Iran*, 491 F. Supp. 1294 (N.D. Tex. 1980); *Richion v. Mahoney*, 62 Cal. App. 3d 604, 133 Cal. Rptr. 262 (1976) (holding that property held by defendant in defendant's name as trustee for another is subject to attachment); *ICC Performance Ltd. P'ship v. Chiota*, No. CV 96338273, 1997 Conn. Super. LEXIS 2419 (Conn. Super. Ct. Sept. 10, 1997) (holding that a partner's right in specific partnership property is not subject to attachment on a claim against an individual partner); *Reich v. Spiegel*, 208 Misc. 225, 140 N.Y.S.2d 722 (N.Y. Sup. Ct. 1955); *Lappas v. Brown*, 335 Pa. Super. 108, 483 A.2d 979 (Pa. Super. Ct. 1984) (holding that funds derived from the illegal sale of marijuana were "derivative contraband" subject to forfeiture; therefore, state held no funds belonging to defendant); *Citizens State Bank v. Caney Invs.*, 733 S.W.2d 581 (Tex. Ct. App. 1987) (holding that a limited partner's right in partnership property is not subject to attachment or execution except on a claim against the partnership); *Milberg Factors, Inc. v. Hurwitz-Nordlicht Joint Venture*, 676 S.W.2d 613 (Tex. Ct. App. 1984) (holding that property of a joint venture is not subject to attachment because it is not the property solely of the debtor and not property which the debtor could pass by sole act); *Allsbrook v. Azalea Radiator Serv., Inc.*, 227 Va. 600, 316 S.E.2d 743 (Va. 1984) (holding that the truck could not be considered a company asset where an individual was named as owner and had personally signed a financing agreement); *A.C.A. Am. Masters, Inc. v. Wertz*, 45 A.D.2d 838, 358 N.Y.S.2d 445 (N.Y. App. Div. 1974) (An attachment of property not belonging to the defendant is without effect and will generally constitute an abuse of discretion).

- 15 -

statement that "*[c]oncerns about 'rights' and 'ownership' of [ccTLD] domains are inappropriate.*  It is appropriate, however, to be concerned about 'responsibilities' and 'service' to the community."  (Enson Decl., ¶ 7, Ex. F at § b (emphasis added); ¶ 15, Ex. N (Letter from Drafting Committee, Alternate ccTLD Best Practices Draft (3 March 2000).)  Put simply, defendants do not "own" these ccTLDs.

### C.    THE RELEVANT ccTLDS ARE NOT WITHIN THE DISTRICT OF COLUMBIA, OR EVEN THE UNITED STATES.

"It is a fundamental rule that in attachment or garnishment proceedings the res must be within the jurisdiction of the court issuing the process…. Property outside the state cannot be attached or garnished."  Am. Jur. Attachment & Garnishment § 23.[4]  Even assuming that the .IR, .SY and .KP ccTLDs constituted property owned by the defendants, they are located outside the District of Columbia, and the United States.

---

[4] *See also Mones v. Commercial Bank of Kuwait*, 399 F. Supp. 2d 310, 317 (S.D.N.Y. 2005) ("[T]here is no statutory authority under New York law to require …a financial intermediary to transfer property from outside this jurisdiction pursuant to Rule 69(a)") (citations and internal quotations marks omitted); *Pacific Decision Scis. Corp. v. Superior Court*, 121 Cal. App. 4th  1100, 18 Cal. Rptr. 3d 104 (2004); *Sara Lee Corp. v. Gregg*, No. 1:02CV00195, 2002 WL 1925703, at *1-2 (M.D.N.C. Aug. 15, 2002) (holding that a writ of attachment cannot reach debtor's property throughout North Carolina, but only such property existing within the district); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Advanced Emp't Concepts, Inc.*, 269 A.D.2d 101, 703 N.Y.S.2d 3 (N.Y. App. Div. 2000); *In re Estate of Ferdinand E. Marcos Human Rights Litig.*, No. 97C0477, 1997 WL 428544, at *2 (N.D.Ill. July, 24, 1997) ("It is not enough that the garnishee be within the jurisdiction of the court; the 'res itself must also be within the court's jurisdiction.'") (citation omitted); *Fidelity Partners, Inc. v. Philippine Export & Foreign Loan Guarantee Corp.*, 921 F. Supp. 1113, 1120 (S.D.N.Y. 1996) ("[T]he issuance of a restraining order and an order of execution….requires that the property sought to be levied against exist within the jurisdiction.") (collecting cases); *Baker v. Bennett*, 644 So. 2d 901 (Ala. 1994) (affirming trial court's dismissal of garnishment proceeding because securities were located outside of Alabama); *Allstate Sales & Leasing Co., Inc. v. Geis*, 412 N.W.2d 30 (Minn. Ct. App. 1987); *Gavilanes v. Matavosian*, 123 Misc. 2d 868, 475 N.Y.S.2d 987 (N.Y. City Civ. Ct. 1984); *Prestige Wine & Spirits, Inc. v. Martel*, 680 F. Supp. 743, 746 (D. Md. 1988) (remedy of attachment is "limited to property located in Maryland"); Restatement (Second) of Conflict of Laws § 67(b) Garnishment of Person in Possession of Chattel (garnishment will not lie when chattel is outside State); 6 Am. Jur. 2d 766, Attachment and Garnishment, § 124 (same); 7 C.J.S. Attachment § 65 (1980) ("[T]he court cannot attach property which is not within the territorial limits of its jurisdiction.").

- 16 -

Although no court has found a ccTLD to be "property," courts have repeatedly found that a ccTLD is "located" where the ccTLD registry is located – in this case, the countries of the ccTLD managers, Iran, Syria, and North Korea.  For instance, the Eastern District of Virginia ruled that the .COM TLD is "located" in Dulles, Virginia, where the .COM Registry Operator is located.  *NBC Universal, Inc. v. NBCUNIVERSAL.com*, 378 F. Supp 2d 715, 716 (E.D. Va. 2005).  Likewise, the same court noted a few years before that if an "infringing domain name were registered in a top-level domain whose registry was outside the United States, jurisdiction in the United States might be avoided entirely."  *GlobalSantaFe Corp. v. GlobalSantaFe.com*, 250 F. Supp. 2d 610, 623 (E.D. Va. 2003).  Accordingly, this court lacks jurisdiction over the ccTLDs at issue, which are not only located outside the District of Columbia, but outside the United States.

### D.   EVEN IF THESE ccTLDS CAN BE CONSIDERED "PROPERTY IN THE UNITED STATES OF A FOREIGN STATE," THIS COURT LACKS JURISDICTION TO ISSUE THEIR ATTACHMENT UNDER THE FSIA.

The FSIA, 28 U.S.C. §§ 1603 *et seq.*, provides in relevant part that "[s]ubject to existing international agreements . . . the property in the United States of a foreign state shall be immune from attachment arrest and execution except as [otherwise] provided."  28 U.S.C. § 1609.  As discussed above, there is no "property in the United States of a foreign state" here to be attached.

In the event that this Court disagrees, however, the FSIA "provides the sole basis for obtaining jurisdiction over [property of] a foreign state in the courts of this country."  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989).  The FSIA provides certain exceptions to the rule that a foreign state's property in the United States is immune from attachment.  Only if one of the FSIA's enumerated exceptions applies may a court assume jurisdiction and apply the District of Columbia's attachment statute to determine the substantive viability of a claim for execution.  *See Corzo v. Banco Central De Reserva Del Peru*, 243 F.3d 519, 522 (9th Cir. 2001); *FG Hemisphere Assocs., LLC v. Republique du Congo*, 455 F.3d 575 (5th Cir. 2006) (court without jurisdiction to execute property of foreign nation through the FSIA cannot issue garnishment order under state enforcement laws).

Of relevance here, Plaintiffs must show that the "property in the United States of a foreign state" is "used for a commercial activity in the United States." 28 U.S.C. § 1610(a); *see Af-Cap, Inc. v. Republic of Congo*, 383 F.3d 361, 367 (5th Cir. 2004) ("a court is prohibited from executing against the property of a foreign state unless [the elements of 28 U.S.C.§ 1610(a) are met]"). As this Court has held, "to determine whether a foreign state's actions are commercial, courts must examine 'whether the particular *actions* that the foreign state performs (whatever the motive behind them) are the *types* of actions by which a private party engages in trade and traffic or commerce." *Flatow v. Islamic Republic of Iran*, 76 F. Supp. 2d 16, 22 (D.D.C. 1999). Moreover, the FSIA indicates that the this commercial activity must have a "substantial contact with the United States." 28 U.S.C. § 1603(e); *see also Flatow*, 76 F. Supp. at 22.

ICANN is aware of no evidence that the .IR, .SY or .KP ccTLDs are "used for commercial activity" of the defendants in the United States. Insofar as the defendants have engaged in any action with respect to the ccTLDs, these actions do not appear to be of the "type…by which a private party engages in trade and traffic or commerce." Regardless, Plaintiffs have offered no evidence suggesting that any such commercial activity (to the extent it exists) had a "substantial contact" with the United States. Accordingly, under the FSIA, this Court lacks jurisdiction to enforce the Writs of Attachment.

### E.   ICANN DOES NOT HAVE THE UNILATERAL POWER OR AUTHORITY TO RE-DELEGATE THE ccTLDS, AND DOING SO WOULD INTERFERE WITH CONTRACTUAL RELATIONSHIPS.

Even if the ccTLDs at issue were considered "property in the United States of a foreign state," ICANN does not "possess" these ccTLDs such that ICANN could transfer or assign them to Plaintiffs or anyone else. Under ICANN's existing IANA Functions Contract, as well as the rules and procedures established by the ICANN community in publications like RFC 1591 and ICP-1, the *only* way that the .IR, .SY or .KP ccTLDs could be re-delegated or transferred starts with a process by which ICANN, among other things, investigates the merits and feasibility of the proposed re-delegations and the qualifications of the proposed new ccTLD managers. (Enson Decl., ¶ 3, Ex. B at § C.2.9.2.a.)  ICANN must then recommend the proposed re-

delegations to the DOC.  (*Id.*)  The DOC, not ICANN, must then decide whether to approve the re-delegation.  (*Id.* at §§ C.8.1)  And finally, if approved, DOC must take step to implement the re-delegations in the Root Zone Database.[5]  (*Id.*)  Thus, ICANN simply does not have the authority or technical ability to effectuate the transfer Plaintiffs seek.  Faced with a similar situation, the court in *Hoffman Chevrolet, Inc. v. Washington  Cnty. Nat'l Sav. Bank*, 297 Md. 691, 703 (Md. 1983), found that "'[i]f the custodian could not transfer, and there is no person before the court with power to transfer the title I do not see how the Court could render a judgment of condemnation under which the bonds could be sold on execution.'"  (*quoting de Bearn v. Prince de Bearn*, 115 Md. 668, 672 (1911)) (internal quotation marks omitted.)  *See also E-Systems, Inc. v. Islamic Republic of Iran*, 491 F. Supp. 1294, 1299 (N.D. Tex. 1980), "[n]o property or interest in property is subject to sale under execution or like process unless the debtor. . . has power to pass title to such property or interest in property by his own act.")

Moreover, Plaintiffs appear to be seeking to force ICANN to make a transfer that the defendants themselves could not force ICANN to perform and that ICANN does not and would not have the power to effectuate.  This violates a cardinal principle of attachment law:  "[A] judgment creditor's rights against a garnishee cannot be greater than those which the debtor would have in the absence of the garnishment."  *Phillips v. Sugrue*, 886 F. Supp. 63, 64 (D.D.C. 1995) (*citing Zink v. Black Star Line, Inc.*, 18 F.2d 156, 157 (D.C. Cir. 1927) ("It is clear that the rights of the creditors of the Black Star Line against the Shipping Board as garnishee cannot rise higher than those which the Black Star Line itself would have had against the board, in the absence of the garnishment.").  As the court in *Petrie v. Wyman*, 35 N.D. 126, 143, 159 N.W. 616, 620 (N.D. 1916) explained:

> "Plaintiff's right to recover against the garnishee is predicated entirely upon
> defendant's right to recover in his own name and for his own use against the

---

[5] In March 2014, DOC announced that it was asking ICANN to convene global stakeholders to develop a proposal to transition the current role played by DOC in this process. While stakeholders work through the ICANN-convened process to develop a transition proposal, DOC's current role remains unchanged.  *See* National Telecommunications & Information Administration Press Release of March 14, 2014, *available at* http://www.ntia.doc.gov/press-release/2014/ntia-announces-intent-transition-key-internet-domain-name-functions.

garnishee.  Unless the defendant could so recover, neither can the plaintiff.  A plaintiff by garnishment cannot place himself in a superior position as regards a recovery than is occupied by the principal defendant.  The garnishee's liability is measured by his responsibility and relation to the defendant.  He can be charged only in consistency with the subject of his contract with the defendant.  And if by any pre-existing bona fide contract his accountability has been removed or modified, it follows that the garnishee's liability is correspondingly affected; for the garnishment cannot change the nature of the contract between the garnishee and the defendant, nor prevent the garnishee from performing his contract with third persons." *Id*. (citations omitted).

As set forth above, ICANN does not have the capability or authority to transfer or re-delegate any TLD, let alone the .IR, .SY. or .KP ccTLDs.

Moreover, any order forcing ICANN to recommend to DOC a transfer of these ccTLDs would interfere with ICANN's contractual obligations to DOC.  Under ICANN's current IANA Functions Contract with DOC, ICANN may recommend re-delegation of a ccTLD manager for narrow technical or ministerial reasons, and it is DOC that retains authority to approve the re-delegation or transfer of a ccTLD.  If enforced along these lines, the Writs of Attachment would force ICANN to recommend re-delegation for reasons not contemplated in the agreements with DOC.  *See Mac Panel Co. v. Virginia Panel Corp.*, 283 F.3d 622, 626 (4th Cir. 2002) (stating that the relief the appellant sought "would require the court to undo current banking and trade arrangements entered into by third parties in reliance on the success of the reorganization plan"); *Baltimore & Ohio R.R. v. Wheeler*, 18 Md. 372, 378-79 (1862) ("The liability of a garnishee in respect of property of a defendant in his hands, is to be determined, ordinarily, by his accountability to the defendant on account of the property.").

### F.    FORCED RE-DELEGATION OF THESE ccTLDS WOULD DESTROY THE VALUE OF THE ccTLDS, THE RIGHTS OF DOMAIN NAME HOLDERS IN THESE ccTLDS, AND JEOPARDIZE THE MANNER IN WHICH INTERNET OPERATES.

The forced re-delegation of these ccTLDs is improper under attachment principles because it would destroy the .IR, .SY and .KP ccTLDs, as they exist today, thereby wiping out any value in the ccTLDs and the rights of the individuals, entities and organizations that registered second-level domain names within the ccTLDs.  Moreover, a forced transfer of the

- 20 -

.IR, .SY and .KP ccTLDs could jeopardize the structure and operation of the single, global Internet.

A transfer of the .IR, .SY and .KP ccTLDs would be largely self-defeating, by destroying whatever value they may have.  These ccTLDs only have value insofar as they can be used by domain name holders around the world.  Unplugging the .IR, .SY and .KP ccTLDs to reassign them to a new ccTLD manager would make the existing ccTLDs inoperable, thereby eradicating the ***hundreds of thousands*** of second-level domain names registered in the .IR, .SY and .KP ccTLDs.  Moreover, any newly-created .IR, .SY and .KP ccTLDs, by virtue of such a transfer, would be devoid of any domain name registrations, the very thing that gives a ccTLD its value and utility.  Thus, the re-delegation of these ccTLDs would not result in any economic value to the Plaintiffs; it would simply destroy a resource utilized by the Internet community.

While this punitive effect may be precisely what is intended, it is not a proper basis for attachment.  It is a long-established rule of common law that attachment is inappropriate where it would effectively destroy any economic value in the property at issue.  *See North v. Peters*, 138 U.S. 271, 11 S. Ct. 346, 34 L. Ed. 936 (1891) (affirming decision that bona fide purchaser of tangible goods sold in a fraudulent transfer could not be garnished by seller's creditors, as garnishment would bring irreparable economic ruin to business); *SBA v. XACT Telesolutions, Inc.*, No. DKC 2005-1230, 2006 U.S. Dist. LEXIS 621, 28-29 (D. Md. Jan. 10, 2006) (noting that invalidating the sale "would adversely affect individuals who are not parties to this case, such as [the debtor's] former employees, bankruptcy creditors, and [the buyer's] current debtors and creditors"); *Granite Constr. Co. v. United States*, 962 F.2d 998, 1007 (Fed. Cir. 1992) (holding that the Corps required Granite to engage in an economically wasteful course of performance and allowing recovery against the government; "The concept of economic waste has long been recognized at common law."); *Fortune v. Evans*, 58 A.2d 919, 920 (D.C. 1948) (declining to award a remedy that would result in unreasonable economic waste); Am. Jur. Attachment & Garnishment § 438 ("A writ of garnishment serves to *preserve* assets of a judgment debtor by creating an inchoate lien that is binding and prevents the garnishee from

disposing of the assets in the garnishee's possession until a judgment is entered in a garnishment proceeding." (emphasis added)); Am. Jur. Attachment & Garnishment § 486 (attaching creditor must bear the loss of natural deterioration and depreciation in value of the garnished property).

In addition to being inconsistent with the principles of attachment, a forced re-delegation carries with it risks to the very manner in which the Internet operates. ICANN's technical mandate is to ensure that the Internet remains stable, secure and interoperable. A transfer of the .IR, .KP and .SY ccTLDs to unidentified and untested ccTLD managers jeopardizes how these ccTLDs independently function and how they interact with the rest of the world. A forced transfer of these ccTLDs would also frustrate the orderly management of the DNS and the continued, reliable functioning of the Internet. Finally, creating a barrier between ccTLDs serving the people of certain countries and the rest of the world "would be disastrous for Internet freedom . . . Fragmenting the global Internet by erecting barriers . . . would give you echo chambers rather than an innovative global marketplace of ideas," as then-Secretary of State Clinton noted in 2011.[6]

## **CONCLUSION**

Plaintiffs' Writs of Attachment are deficient on a number of separate and independent grounds. Non-party ICANN respectfully requests that they be quashed.

---

[6] Remarks by Secretary of State Clinton at the Conference of Internet Freedom (Dec. 8, 2011), *available at* http://www.state.gov/secretary/rm/2011/12/178511.htm.

Dated: July 29, 2014                    Respectfully submitted,


                                        */s/ Tara Lynn R. Zurawski*
                                        Tara R. Zurawski (DC Bar No. 980960)
                                        JONES DAY
                                        51 Louisiana Avenue, N.W.
                                        Washington, D.C.  20001-2113
                                        Email: tzurawski@jonesday.com
                                        Telephone: (202) 879-2113
                                        Facsimile: (202) 626-1700

                                        Jeffrey A. LeVee (*pro hac vice* pending)
                                        Eric P. Enson (*pro hac vice* pending)
                                        JONES DAY
                                        555 South Flower Street, 50th Floor
                                        Los Angeles, CA 90071
                                        Telephone: (213) 243-2304
                                        Facsimile: (213) 243-2539
                                        Email: jlevee@jonesday.com
                                        Email: epenson@jonesday.com

                                        Counsel for Non-Party INTERNET
                                        CORPORATION FOR ASSIGNED NAMES
                                        AND NUMBERS

LAI-3219953v1

## CERTIFICATE OF SERVICE

I certify that on July 29, 2014, I filed the foregoing **Memorandum In Support Of Non-Party Icann's Motion To Quash Writs Of Attachment** with the Clerk of the Court for the U.S. District Court for the District of Columbia using its CM/ECF System, and I caused to be served one copy of the foregoing Motion by First Class Mail, postage prepaid, on the following:

> Robert J. Tolchin
> Berkman Law Office, LLC
> 111 Livingston Street, Suite 1928
> Brooklyn, NY 11201
>
> *Counsel for Plaintiffs*

Dated:  July 29, 2014

*/s/ Tara Lynn R. Zurawski*
_____

Tara Lynn R. Zurawski (DC Bar No. 980960)

LAI-3219953v1